UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:21 CR 271 |
| | ) | |
| MOHAMMED KHALIFA, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S SENTENCING POSITION

COMES NOW, Mohammed Khalifa, the defendant, by and through counsel, and respectfully requests that the Court impose a sentence of 20 years of imprisonment in this case.[1] This sentence is warranted for the following reasons: 1. In view of Mr. Khalifa's repudiation of the violence that stands at the core of this case; 2. To avoid unwarranted sentencing equality with the co-defendants in this case; 3. To avoid the incentivizing of international forum shopping; 4. In view of the unusually harsh detention circumstances to which Mr. Khalifa was subjected while in custody in Syria; 5. In view of the different prison conditions in the federal Bureau of Prisons that can be expected at a sentence of 30 years or greater.

---

[1] Last week, defense counsel advised the prosecution about time-sensitive conflicts that had unexpectedly arisen with counsel, and the government interposed no objection to the defense filing this memo one business day later.

1

## I. USSG Calculations in the PSR Report

The defense has no objection to the sentencing guidelines as calculated by the Probation Office.

## II. 3553(a) Considerations

1. <u>Mr. Khalifa did not participate in the violence at the core of this case, and expressed regret over it having occurred well before his arrest in this case.</u>

Mr. Khalifa's codefendants in this case engaged in the brutal, horrifying torture and execution of American citizens. Importantly, Mr. Khalifa did not. Moreover, and unlike his codefendants, he expressly and publicly, and long before he was extradited to the United States, stated regret and remorse over that conduct. And the government recognized these disparities between Mr. Khalifa and Kotey and El-Sheikh, which is reflected in the fact that Mr. Khalifa is the only defendant of the three who was able to plead guilty to an offense that does not carry a mandatory minimum sentence. Mr. Khalifa's actions militate toward a sentence of 20 years of incarceration that, while still lengthy, is not greater than necessary.

The trial of El-Sheikh showcased the horrific, sociopathic conduct at the core of this case: Speaking of the codefendants and others with direct access to U.S. and Western prisoners, "they were all extremely violent and always sadistic," testified Didier Francois, a French journalist kidnapped in June 2013.

> They [the codefendants, not Mr. Khalifa] repeatedly invoked the U.S. camp at Guantánamo Bay, saying they wanted to "re-create the conditions" and the torture of detainees there, the hostages said. They put the hostages in orange jumpsuits, waterboarded them and shocked them with electric wires. They gave the emaciated captives dog names and forced them to fight each other for sport. They beat them until their bones broke and their teeth were knocked out.
> . . .

> Francois testified that he was taken early on to the abandoned hospital, where French ISIS guards deprived hostages of water for so long that some started hallucinating and drinking their own urine. But when he was transferred to another makeshift prison, he met Cantlie and Foley, who were shocked to be allowed to speak at all. That's when Francois learned about the "pure terror" of the Beatles.
>
> Whenever the Beatles came through, the survivors testified, they would complain that other guards had given the prisoners too much food and comfort. They beat the captives until some asked for death; two Beatles would hold a captive in the middle of the room while the third used him like a punching bag. But beyond the physical pain, Francois testified, "They would always try to break your mind."
>
> French journalist Nicholas Henin said the three captors made the hostages sing a song called "Hotel Osama" to the tune of the Eagles' hit "Hotel California," with lyrics that referred to the beheading of an aid worker in Iraq: *"Welcome to the Hotel Osama, you will never leave. If you try, you will die."*
>
> Motka testified that he and his colleague were at one point placed in a cell with Foley and Cantlie for what the Beatles described as a "royal rumble."
>
> Motka said the malnourished captives were ordered to fight each other. The Beatles did a sports broadcaster-style play-by-play as the emaciated men punched at each other. Some passed out.
>
> "We were so weak and shattered we barely had strength to lift our arms," Motka told the jury.[2]

Importantly, Mr. Khalifa did not participate in any of this conduct. And moreover, when he learned of it, he expressed regret over it, according to an interview he gave while imprisoned in Syria:

> However, in prison, Khalifa began to hear things about ISIS's brutality and unjust rule that he had previously "dismissed as baseless rumors" living his privileged media life in Raqqa: "When I was in prison talking to basically a lot of people, hearing their conversations among each other, for the most part, then I realized, okay, these guys are not making it up […] Lots of injustices at the hands of the emni [ISIS internal security], the security guys […] prisons, torture, false confessions, and that sort of thing."

---

[2] https://www.washingtonpost.com/dc-md-va/2022/04/12/elsheikh-isis-trial-hostages/

> . . . I'm repentant, for basically to a certain extent I feel like I ignored what was going on. I ignored the warning signals. I dismissed [them] prematurely […] I hope I didn't have anything to do with [the injustices]." He maintains, "If I actually, like, witnessed something and maybe was convinced something was wrong going on, I wouldn't be afraid to bring it forward through, like, appropriate channels and see if it could get addressed, but at the same time, I wasn't the type of guy who would go looking for trouble, so to speak; I kind of pretty much just mind my own business."[3]

It is additionally noteworthy that according to the interviewer "Khalifa was far more forthcoming in his ICSVE interview than was Kotey, who recently pleaded guilty but at the time of our interview was still playing cat-and-mouse about his involvement in the torture of Western hostages."[4]

In another article entitled "The English Voice of ISIS Speaks Out Against the Group," journalists Anne Speckhard and Molly Ellenberg wrote that:

> Now, however, Khalifa is speaking out against his infamous predecessor and the group for which he was once the most well-known English-speaking voice. In May 2019, Khalifa agreed to participate in the creation of counter-narrative videos as part of ICSVE's *Breaking the ISIS Brand Counter Narrative Project*. After an in-depth psychological interview conducted by ICSVE director Dr. Anne Speckhard, Khalifa consented for the videoed interview to be cut to create counter-narrative videos and gave permission for his real name to be used and for his face to appear in the videos.
> . . .
> Khalifa, being a high-level part of the media arm of ISIS similar to the ISIS *emni* (secret police) and leadership, lived a privileged and protected life inside ISIS and was not subjected or even fully aware, according to his claims, of the extent of ISIS' brutality toward their own. It was after his capture by the Syrian Democratic Forces (SDF) that Khalifa began to become disillusioned with ISIS. Hearing the stories of his fellow prisoners, he understood that what he had previously thought were rumors about ISIS' brutality, especially that of the *emni*, were actually true. He was also disillusioned by ISIS' practice of *takfir*. He was horrified at the idea that he should denounce his own parents as apostates, in ISIS' view, deeming them worthy of death.

---

[3] https://www.hstoday.us/featured/perspective-who-is-accused-isis-propagandist-mohammed-khalifa/

[4] https://www.hstoday.us/featured/perspective-who-is-accused-isis-propagandist-mohammed-khalifa/

> . . .
>
> In another video, "Does Following Anwar al-Awlaki's Teachings Make You Safe on the Day of Judgment?", Khalifa explains, "There is always like discussions by scholars related to jihad and what the boundaries are […] On the takfir issue, no, I'm against that […]," he says, asking what his own parents could have done to deserve to be takfired.
>
> . . .
>
> Finally, in a very short video designed for use on Facebook counter-narrative campaigns, titled "The New Scholars of the Islamic State Caliphate," Khalifa says of his time in ISIS, "I've learned along the way that a lot of the problems had to do with the fact that they wouldn't follow the texts exactly as they should be […] Learning to do your own research and having the tools at hand, it'll keep me from just swallowing anything I see from ISIS or anyone else."
>
> Will the "English voice of ISIS" be able to convince those vulnerable to radicalization to turn away from militant jihadism and the teachings of Anwar al-Awlaki?
>
> . . .
>
> Khalifa is now admitting guilt in secular court as well, having just pled guilty to charges against him this month. Yet, the opinions of those most susceptible to militant jihadist radicalization and recruitment are unlikely to hinge on Khalifa's contrition, but rather on the emotionally evocative way in which he describes how militant jihadist scholars like al-Awlaki influenced him to take actions so terrible that he is afraid of the day that he will have to account for his sins in front of God. Perhaps these individuals will be swayed, perhaps not for the first time, by the voice of Mohammed Khalifa.[5]

This conduct greatly distinguishes Khalifa from his codefendants. Not only did he express regret over their conduct, he affirmatively created a "counter narrative" set of videos in the hopes he could persuade others to turn away from ISIS in the future and not repeat the mistakes that he made.

> 2. <u>Receiving a sentence that is effectively equal to those of Kotey and El-Sheikh would create an unwarranted sentencing equality between disparate conduct.</u>

---

[5] https://www.hstoday.us/featured/perspective-the-english-voice-of-isis-speaks-out-against-the-group/

As reflected in the charging decisions in this case, the government recognizes that although the conduct of Mr. Khalifa was extremely serious and worthy of significant punishment, it is not so heinous as to require a mandatory life sentence as in the case of his codefendants. The Washington Post article detailed the acts in which Kotey and El-Sheikh engaged. As explained above, Mr. Khalifa did not engage in those acts, expressed sincere regret over those actions, and expressed hope that he "hope[d] I didn't have anything to do with [them]."

Mr. Khalifa did execute Syrian soldiers. However, he explained his rationale in his interview in Syria:

> This actually was a common sentiment among ISIS members who were well aware of the Syrian soldiers' widespread practices of rape and torture. Some ISIS fighters even told ICSVE that when the Syrian regime soldiers picked up the walkie-talkie channels of ISIS they would interrupt to say, "Listen, brothers, to the screams of your women being raped," and then play the sounds of women being raped. Khalifa's coldness in the face of ISIS executions of Syrian soldiers should thus be seen in the context in which it occurred.[6]

Unlike professional western military forces, many SDF forces did not follow Geneva convention protocols and engaged in conduct which in many cases mirrored that of ISIS. It is for that reason that even the journalist who interviewed Mr. Khalifa noted that these types of executions "should thus be seen in the context in which it occurred." Further, the execution of Syrian soldiers is not an offense over which the United States has jurisdiction, and importantly, these summary executions did not involve gratuitous torture of the type witnessed in the cases of Kotey and El-Sheikh. Moreover, as reflected in the plea agreement in this case, the government has also recognized the differences between these defendants.

---

[6] https://www.hstoday.us/featured/perspective-who-is-accused-isis-propagandist-mohammed-khalifa/

A sentence of 30 years or more creates an unwarranted sentencing equality for vastly disparate conduct. Mr. Khalifa is 40 years old. A recent study "identified a linear relationship between incarceration and life expectancy: for each year lived behind bars, a person can expect to lose two years off their life expectancy."[7] Further, "an incarcerated person's health often matches that of a non-incarcerated person who is 10-15 years older. In other words, 55-year-olds in prison have the health of a 65 to 70-year-old."[8] A 30-year sentence for Mr. Khalifa would be expected to be an effective life-sentence. This is especially true in his case, where he already suffers from serious health issues, and has been recently emergency hospitalized in the Alexandria Detention Center from atrial fibrillation on May 30-31 of this year.[9] Further, "U.S. recidivism rates decrease as prisoners get older – dropping to 5% for those age 50 to 64 and reaching less than 1% by age 65."[10] A sentence of less than 30 years is appropriate given the differences between the Khalifa and his co-defendants in this case.

       3. <u>This Court should discourage international forum shopping.</u>

After Mr. Khalifa was brought to the United States instead of Canada, many commentators took note of the unusual legal posture of the case. One wrote that "[t]he indictment is a big deal, both because of the person it implicates and because it's a U.S. court trying a Canadian man for crimes committed in Iraq and Syria."[11] Mr. Khalifa never personally actually laid his hands on

---

[7] https://www.prisonpolicy.org/blog/2017/06/26/life_expectancy/
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7710643/

[8] https://www.nydailynews.com/opinion/ny-oped-aging-and-dying-behind-prison-bars-20210531-6rwa672ntfha5iefpas6sr7hum-story.html

[9] The government advised defense counsel of this emergency medical treatment shortly after it occurred. The defense confirmed the treatment. The defense has not yet received the medical treatment records.

[10] https://www.prisonlegalnews.org/news/2019/jan/8/aging-prison-population-finds-parole-elusive/

[11] https://www.lawfareblog.com/lawfare-podcast-us-prosecutors-indict-canadian-isis-propagandist

Americans or ordered anyone else to do so. The scholarly commentary described the case as involving "weird legal machinations."[12] Essentially, the legal theory was that although Mr. Khalifa is not a US citizen or resident, and was never directly involved with any US citizen or resident, he was involved with ISIS, and he is therefore indirectly criminally responsible. While we do not contest the applicability of this theory and by extension US jurisdiction, what makes the case unusual is that it sends a message that even if prosecution is far more appropriate by another country than the US, if that country simply chooses to do nothing, the US will ultimately prosecute rather than risk nothing happening. It is worth recalling that Canadians also died at the hands of ISIS.

It has been noted that the Canadian government has "not repatriated anyone" from ISIS territory.[13] Other commentators note that they "don't think we should be relying on the United States to repatriate Canadians in this way."[14] The article further noted that "[t]he U.S. has repeatedly appealed to countries like Canada to repatriate and prosecute their citizens held at the Kurdish-run detention facilities." Canada has a far more lenient justice system. In a recent study of terrorism sentences in Canada, it was noted that "[a]mong the more serious cases – Khawaja, Amara, Dirie, Ahmad, and Namouh – the sentences range from between 2 years (of a notional 7 years in Dirie) to life. Moreover, with life sentences carrying a 10-year parole ineligibility period that dates from the time of arrest, a significant discrepancy still exists . . ."[15]

Effectively, what Canada (as well as some European countries which also have more liberal justice regimes) is doing is passively causing the matter to be forum-shopped out to a jurisdiction

---

[12] *Id.* at 17:00.
[13] *Id.* at 18.
[14] https://globalnews.ca/news/8241634/canada-should-have-prosecuted-voice-of-isis/
[15] https://ciaj-icaj.ca/wp-content/uploads/documents/1974/01/818.pdf?id=981&1641891182 at 17.

with harsher penalties. In Canada, Mr. Khalifa would be eligible for parole after ten years. And it would be the responsibility of the Canadian government and citizens to both pay for his incarceration and provide for his needs upon release. But by forcing the United States to take the case by doing nothing, the entire burden is shifted to the United States government and United States taxpayer. This should be disincentivized, lest other countries draw the same conclusions. Upon the completion of his sentence in this case, Mr. Khalifa will be deported to Canada, where he is a citizen. The Court should fashion a sentence that shifts at least some of the burden to the Canadian government and its taxpayers and does not set a precedent whereby the United States and its citizens are expected to absorb the burden for individuals who are far better suited to prosecution in their home jurisdictions. *See, e.g., La Plante v. Am. Honda Motor Co.*, 27 F.3d 731, 742 (1st Cir. 1994) ("this general rule was adopted in order to discourage forum shopping."); *Crowther v. I.N.S.*, 64 F.3d 666 (9th Cir. 1995) ("this Court should discourage forum shopping"); *Org. for Advancement of Minorities with Disabilities v. Brick Oven Rest.*, 406 F. Supp. 2d 1120, 1132 (S.D. Cal. 2005) ("a legitimate function of the federal courts is to discourage forum shopping.").

    4. <u>The Court should reduce the sentence appropriately to account for the especially harsh conditions of confinement while Mr. Khalifa was in Syria.</u>

This Court should in this case, as it has in at least one other prior case, give due credit for inhumane prison conditions suffered by the defendant prior to his extradition to the United States. In *United States v. Jose Diaz Barajas*, 1:12cr398, this Court reduced the defendant's sentence by more than a day for day credit in view of the conditions of confinement he suffered while abroad. In that case, the defendant was at the Ari Franco prison in Brazil, which subjected him to inhumane conditions including an overcrowded cell, malnutrition, skin disease, lack of toilet paper, and other

9

hazards. European judges awarded credit at a rate of 3 or 4 days of credit for each day spent in this prison. One individual noted a German court in his case awarded him 3 days credit for each day served on account of the conditions of the prison, and attached the judicial opinion of the German Court in Frankfurt to his letter.[16] The opinion concluded on page 14 in the last paragraph by noting that it would apply a ratio of credit of 3 days credit for each day served in light of the prison conditions to which he was subjected. Lars Wallis, who was extradited to Sweden, was also given 3 days credit for each day served. Peter Chapman, was given 4 days credit for each day served. As in *Diaz Barajas*, it is equally important here for credit for time served to reflect inhumane prison conditions to which the defendant was subjected. The United States values human rights and dignity equally to our European counterparts.

      Here, the prison conditions were far worse than in the case of *Diaz Barajas*. Mr. Khalifa was housed in a Syrian from January 13, 2019 to September 30, 2021, almost three years. During that period of time, Mr. Khalifa was subjected to physical and other torture. The torture is detailed in his letter to the Court, which is attached.[17] The defense asks the Court to take into account that Mr. Khalifa was incarcerated prior to his transfer to U.S. authorities in harsh conditions and that neither that period of incarceration nor those conditions will be taken into account by the BOP when it allocates credit for time served. The defense asks the Court to fashion a sentence that accounts for that period of time and conditions.[18]

---

[16] *See* Exhibit A. Further supporting documentation may be viewed as Exhibit H through J attached to Defendant's Sentencing memo in *United States v. Diaz*, 1:12cr398 (EDVA).
[17] *See* Exhibit B.
[18] Additionally, it is noted that Mr. Khalifa has been housed at the Alexandria ADC during the COVID-19 pandemic. Some judges have afforded additional sentencing consideration given the lack of programming, movement, visitation, and other restrictions associated with such confinement during the pandemic.

5. Mr. Khalifa should be a given a sentence that allows for something less than the most inhospitable prison conditions.

In the BOP system, there is an enormous difference between a sentence of 30 years or greater and a sentence under 30 years. As reflected in the BOP designation manual, Chapter 5 page 9,[19] "a male inmate with more than 20 years remaining to serve will be housed in at least a Medium security level institution" but "[a] male inmate with more than 30 years remaining to serve (including non-parolable LIFE sentences) will be housed in a High security level institution." Only about 10% of inmates are placed in high security facilities, and they are predominantly extremely violent and unruly.[20]

The difference between a high security facility and a medium security facility is night and day. In a high security facility "[g]angs are a dominant presence and racial and gang violence is rampant at the high security level."[21] Others provide the following description:

- **Population**: United States Penitentiaries are the most volatile of all federal prisons. For the most part, individuals who serve time inside of a USP have extensive histories of violence. Tensions rise from gangs, organized crime, and a heavy concentration of psychotic people who live without hope or expectations of ever living a normal life as a law-abiding citizen. As a consequence of sentencing laws that punish people extensively for high-dollar crimes, a relatively small percentage of people on the compound will be serving time for white-collar crimes. Regardless of criminal background, everyone in the penitentiary will share common areas together.
- **Culture**: Prisoners in the penitentiary live by a different code than exists in the world outside. High levels of violence and tension permeate the atmosphere, with manipulation, extortion, and altercations occurring daily. Many of the men serving time inside of USPs are militant by nature, and stubbornly resistant to authority. Volatility is a constant in a USP.
- **Structure of the Day**: On a normal day, guards will unlock penitentiary doors at 6:00 am. They may move to the chow hall for breakfast, or they may have limited access to the recreation yard. At 7:30, the men will either report to work, to a program, or they will return to their cell for a lockdown period. As a consequence of high levels of violence in the

---

[19] https://www.bop.gov/policy/progstat/5100_008cn.pdf
[20] https://www.bop.gov/about/statistics/statistics_inmate_sec_levels.jsp
[21] https://prisonerresource.com/security-levels-federal-bureau-prisons/

penitentiary, prisoners confined to USPs spend a lot of time locked in their cells. Sometimes they're on "Lockdown" for weeks at a time.

Mr. Khalifa has been fully compliant with all rules during his period of confinement upon his arrest and transfer to US custody (as he was in Syria). He is polite and respectful with the staff. He has shown substantial efforts towards rehabilitation. And he suffers from health problems: atrial fibrillation which is aggravated by anxiety, anxiety, and severe back pain (from his time in Syria). While we do not dispute that substantial punishment is appropriate, we believe the totality of the circumstances are such that he should be spared the type of extremely difficult and harsh confinement that one experiences if one receives a sentence of 30 years or more (which the BOP treats like a life sentence).

### III. Conclusion

For the foregoing reasons, we respectfully request the Court impose a sentence of 20 years of imprisonment.

Respectfully Submitted,

Dated: 7/25/2022

/s/ Edward J. Ungvarsky
EDWARD J. UNGVARSKY
Ungvarsky Law, PLLC
114 N. Alfred Street
Alexandria, VA 22314
(571) 207-9710 – office
(571) 777-9933 – fax
ed@ungvarskylaw.com

*/s/ Cary Citronberg*
Cary J. Citronberg
Zwerling Citronberg PLLC
114 N. Alfred Street
Alexandria, VA 22314-3011
(703) 684-8000
cary@zwerling.com

## CERTIFICATE OF SERVICE

I certify that on 25th day of July, 2022, a copy of the foregoing was mailed electronically.

Service of this filing will by email to all ECF-registered counsel.

*/s/ Cary Citronberg*
Cary J. Citronberg
Zwerling Citronberg PLLC
114 N. Alfred Street
Alexandria, VA 22314-3011
(703) 684-8000
cary@zwerling.com
